IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DERIC LaVELLE MAY, AIS # 209534, | : | |
| Plaintiff, | : | |
| vs. | : | CIVIL ACTION 14-0479-WS-N |
| PAMELA BARBER, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

This § 1983 action, filed by an Alabama prison inmate proceeding pro se, was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4) for appropriate action. When the complaint was filed, plaintiff did not file a motion to proceed without prepayment of fees nor pay the $400 filing fee, which he is required to pay as a "three-striker" unless he meets the exception to 28 U.S.C. § 1915(g). After reviewing plaintiff's complaint, it is recommended that this action be dismissed without prejudice pursuant to 28 U.S.C. § 1915(g).

Section 1915(g) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section [28 U.S.C. § 1915] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

The purpose of this section is to curb abusive prisoner litigation by requiring a prisoner who has had three actions or appeals dismissed as meritless to pay the full filing fee when his next action is filed.  Dupree v. Palmer, 284 F.3d 1234, 1236 (11th Cir. 2002).  "The only exception to section 1915(g) is if the frequent filer prisoner is 'under imminent danger of serious physical injury.'"  Rivera v. Allin, 144 F.3d 719, 723 (11th Cir. 1998), overruled on other grounds by Jones v. Bock, 549 U.S. 199, 215-16 (2007).

Even though plaintiff is known to this Court as a "three-striker," the Court reviewed the records of the United States District Court for the Southern, Middle, and Northern Districts of Alabama to verify that he has three or more in forma pauperis actions or appeals that were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief can be granted.  From this review the Court discovered plaintiff has seven actions and appeals that were dismissed based on one of the foregoing reasons, namely, May v. Culliver, CA 10-0121-CG-C (S.D. Ala. Feb. 24, 2012) (failure to state a claim), appeal dismissed  (11th Cir. Sept. 20, 2012) (frivolous); May v. Patterson, CA 12-0703-KD-N (S.D. Ala. Sept. 5, 2013) (malicious), appeal dismissed (11th Cir. June 4, 2014) (frivolous); May v. Barber, CA 13-0237-CB-C (S.D. Ala. July 22, 2013) (malicious), appeal dismissed (11th Cir. July 24, 2014) (frivolous); May v. Patterson, App. No. 13-14499-C (11th Cir. June 26, 2014) (frivolous) (corresponding district court case is CA 11-0675-KD-B (S.D. Ala.  Sept. 9, 2013) (dismissed on defendants' summary judgment motion)).[1]

---

[1]   In addition to these actions, plaintiff has filed seven other actions on this Court's docket and another action in the Northern District of Alabama.  Based on a review of all plaintiff's actions, aeven of plaintiff's actions contain claims based on medical issues related to plaintiff's head, namely, May v. Culliver, CA 10-0121-CG-C; May v. Patterson, CA 11-0675-KD-B; May v. Barber, CA 13-0237-CBC; May v. Barber, CA 13-0429-CB-M; May v. Hetzel, CA 14-0155-CG-C; May v. Thomas, CA 13-0385-CB-M; and May v. Barber, CA14-0479-WS-N (present action).   Furthermore, five of his actions have been dismissed pursuant to 28 U.S.C. § 1915(g), namely, May v. Barber, CA 13-0429-CB-M; May v.

In order to avoid the dismissal of the present action pursuant to § 1915(g), plaintiff must satisfy the exception to § 1915(g), which requires that at the time of the complaint's filing, he show that he was "under imminent danger of serious physical injury." See Adbul-Akabar v. McKelvie, 239 F.3d 307, 315 (3d Cir. 2001) ("By using the term 'imminent,' Congress indicated that it wanted to include a safety valve for the 'three strikes' rule to prevent impending harms, not those harms that had already occurred."), cert. denied, 533 U.S. 953 (2001); Brown v. Johnson, 387 F.3d 1344, 1349 (11th Cir. 2004) ("a prisoner must allege a present imminent danger, as opposed to a past danger, to proceed under section 1915(g)"); Medberry v. Butler, 185 F.3d 1189, 1193 (11th Cir. 1999) (the plaintiff must face imminent danger of serious physical injury at the time the complaint is filed, not at a prior time).

In determining if the exception to § 1915(g) is satisfied, "the issue is whether his complaint, as a whole, alleges imminent danger of serious physical injury." Brown, 387 F.3d at 1350. To make this showing, a plaintiff "must allege and provide specific fact allegations of ongoing serious physical injury, or a pattern of misconduct evidencing the likelihood of imminent serious physical injury[.]" Ball v. Allen, CA No. 06-0496-CG-M, 2007 WL 484547, at *1 (S.D. Ala. Feb. 8, 2007) (citation and quotation marks omitted) (unpublished) (Granade, C.J.). Plaintiff has not done this.

On October 14, 2014, the Court received plaintiff's complaint signed October 9, 2014 and postmarked October 10, 2014. (Id. at 7). In the complaint the plaintiff specifies that the date of the complained of incident is April 11, 2013, which is when the sole defendant, Dr. Barber, allegedly did not request a consultation so plaintiff could be evaluated. (Id. at 5).

---

Howard, CA 13-0557-CG-C; May v. Smith, CA 14-0171-CG-B; and May v. Myers, CA 14-0271-KD-B; May v. Thomas, CA 13-0385-CB-M.

Plaintiff's facts supporting his claim reflect that "on April 11, 2013, [plaintiff] placed a grievance on file that his medical reports confirmed that Dr. Quindlen had impressions of a cerebral AVM." (Id. at 4). The Health Service Administrator told plaintiff that he spoke with defendant Barber, who said that she would request a consultation for plaintiff with a neurosurgeon. (Id.). Plaintiff complains that months passed and an appointment was not set up. (Id.).

In his allegations, plaintiff defines arterial venous malformation ("AVM"),[2] and states that

> He has never received medical care for [his AVM] and he has ongoing complications such as headaches etc. and condition will deteriorate. Further at any time, . . . it pose[s] an imminent danger of serious physical injury to [plaintiff] due to [his] condition [being] left untreated[;] therefore [defendant Barber] placed [plaintiff's] health into jeopardy [of] ongoing danger. These are not conclusory allegations. It is a known fact

---

[2] Plaintiff defines AVMs as being,

> Dilated, tangled blood vessels in which arteries flow directly into veins and form a cluster of tangled veins and arteries. AVM's are a circulatory defect comprised of snarled tangled up arteries and veins[,] which lack the normal capillary connection. In the absence of capillaries[,] the normal r[ou]te of oxygen delivery to [the] brain is compromised[.] In AVM's, arteries dump blood directly into veins through a passageway called a fistula. The flow rate is uncontrolled and extremely rapid-to[o] rapid to allow oxygen to be dispersed to surrounding tissues. This abnormally rapid rate of blood flow frequently causes blood pressure inside the vessels located in the central portion of an AVM directly adjacent to the fistula[-]an area doctors refer to as the nidus, from the Latin word meaning "nest to rise to dangerously high levels[.]" The arteries feeding blood into the AVM often become swollen and distorted; the veins that drain blood away from it often become abnormally constricted (a condition called stenosis). Moreover, walls of the involved arteries and veins are often abnormally thin and weak. Aneurysms— balloon[-]like bulges in blood vessel walls that are susceptible to rupture—may develop in association with approximately half of all neurological of all AVM's due to this structural weakness.

Doc. 1 at 8. Plaintiff's definition is almost identical to the definition included by the Court in the Report and Recommendation entered in May v. Barber, CA 13-0429-CB-M (S.D. Ala. Dec. 2, 2013) (Doc. 7 at 10).

4

>that AVM's can form an aneurysm[] as mentioned in paragraph 2 and aneurysms can burst causing severe complication or death.

(Id. at 9).

Plaintiff filed his complaint on or about October 10, 2014, according to the postmark on the envelope. Houston v. Lack. 487 U.S. 266, 276, 108 S.Ct. 2379, 2385, 101 L.Ed.2d 245 (1988) (a prisoner's pleading is deemed filed when the prisoner "deliver[s] it to the prison authorities for forwarding to the court clerk"); Garvey v. Vaughn, 993 F.2d 776, 783 (11th Cir. 1993) (extending Houston to § 1983 actions filed by pro se prisoners). And the incident about which he complains concerning the sole defendant, Dr. Barber, occurred on April 11, 2013.

Absent from plaintiff's allegations is information showing that at the time of filing near October 10, 2014, he was in imminent danger of serious physical injury. Plaintiff has an underlying serious medical condition with which he has been living, as reflected by his prior litigation in this Court, and which is described infra as well as the medical treatment provided. However, in the present complaint's allegations do not show an unfavorable change in his condition that would have caused his medical condition to put him in imminent danger of suffering a serious physical injury. Plaintiff's allegations relate to the time period around April 11, 2013; whereas, specific allegations and details are notably absent near the time of the complaint's filing on October 10, 2014. Plaintiff merely concludes that because it is not treated as he would like, defendant Barber "placed [his] health into jeopar[d]y of ongoing danger." (Id. at 9). Plaintiff's allegations do not demonstrate that he was in danger of a serious physical injury that was imminent at the time of filing. Accordingly, plaintiff cannot avail himself of the exception to § 1915(g).

Even though plaintiff is not entitled proceed in this action, the Court briefly reviewed some of plaintiff's litigation history because he has been actively engaged in litigation

5

concerning medical issues associated with his head over the past few years.  Of particular interest is the timing of the present complaint's filing on October 10, 2014, which was after a recommendation of dismissal was entered on September 17, 2014 in May v. Hetzel, CA 14-0155-WS-M, with dismissal occurring on October 7, 2014.[3]

Furthermore, through plaintiff's prior litigation, some of his medical history is available to the Court and reflects that he receives medical treatment for medical issues with his head.  In May v. Culliver, CA 10-0121-CG-C (S.D. Ala. Feb. 24, 2012) (dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)), appeal dismissed (11th Cir. Sept. 20, 2012) (frivolous), cert. denied, (U.S. May 14, 2013), plaintiff alleged that he was injured in a fight, which caused swelling around his 20-year-old ventriculoperitoneal ("VP") shunt.  (Doc. 8 at 9).  Because the neurosurgeon at Caraway Hospital could not find the top of the shunt, he thought that he would be sent back to the neurosurgeon who had performed a "rare brain surgery" on him and had removed an excessive amount of AVMs.  (Id. at 9-11).  Subsequently, plaintiff was transferred to Holman Correctional Facility on or about March 14, 2008.  (Id. at 9,10).  A CT scan of his bran was done on April 23, 2008 at Atmore Community Hospital, which Dr. Barnes, the doctor at Holman, told him showed no AVMs, but plaintiff was not allowed to receive a copy of the report.  (Id. at 12).  Dr. Epperson, a neurologist in Montgomery, saw swelling at the top of the VP shunt on the CT scan and wanted plaintiff to see a neurosurgeon.  (Id.).  Plaintiff was taken to University Medical Center at the University of South Alabama for an appointment with a neurosurgeon, Dr. Eugene Quindlen, who was not able to proceed because plaintiff's CT scan did not accompany plaintiff and was determined to be lost.  (Id. at 13).

---

[3] The Court takes judicial notice of its records.  Nguyen v. United States, 556 F.3d 1244, 1259 n.7 (11th Cir. 2009).

6

In <u>May v. Patterson</u>, CA 11-0675-KD-B (S.D. Ala. May 21, 2012), 2012 WL 1840770, the Court, in its recommendation granting defendants' summary judgment motion, recounted that in 1990 surgery was performed to place a VP shunt in plaintiff's head to alleviate his hydrocephalus. (Doc. 69 at 1). Then, in 1991 and 1992, plaintiff underwent resection of two AVMs of the brain. (<u>Id.</u> at 2). The Court continued noting the medical care plaintiff had received with regard to his complaints of headaches. Lastly, the Court wrote that plaintiff was seen for a second time by Dr. Quindlen who determined that plaintiff did not suffer from elevated intracranial pressure but was experiencing poor shunt function. (<u>Id.</u> at 6). Even though surgery was approved for plaintiff to have a shunt revision, plaintiff refused to allow Dr. Qunidlen to proceed because he was not plaintiff's surgeon of choice. (<u>Id.</u>). The Court noted that it did not have any knowledge whether the surgery was performed. (<u>Id.</u> at 7).

Then, in <u>May v. Barber</u>, CA 13-0429-CB-M (S.D. Ala. Dec. 2, 2013), 2013 WL 6228881, plaintiff complained about an AVM. Dr. Barber again was the sole defendant. Plaintiff alleged that Dr. Barber delayed or denied medical care (Doc. 4 at 5) when she said that she was going to obtain a consultation with a neurosurgeon due to a 2010 medical report in which Dr. Quindlen noted cerebral AVMs. (<u>Id.</u> at 4). Plaintiff also alleged that on July 9, 2013, he signed up to be examined because 2009 medical reports "revealed postoperative changes with significant artifacts in the posterior fossa secondary to multiple metallic objects secondary to surgery for repair of arterial venous malformation." (<u>Id.</u> at 5). He maintained that defendant Dr. Barber had not seen him even though she knew that "AVM[s] can grow back." (<u>Id.</u>). Plaintiff's complaint was dismissed pursuant to 28 U.S.C. § 1915(g) because he did not show that he was under imminent danger of serious physical injury at the time of filing. <u>Id.</u> at 11.

In May v. Hetzel, CA 14-0155-WS-M (S.D. Ala. Oct. 7, 2014), 2014 WL 5072693, at *1-2, appeal filed (11th Cir.), even though the Court knew plaintiff was a "three-striker," the Court served plaintiff's complaint, noting in the Report and Recommendation that it did so "[b]ecause the Court acknowledges that hydrocephalus can be a serious medical condition, and because Plaintiff contends in his Complaint that Defendants interfered with his attempts to schedule sick calls for his malfunctioning shunt[.]" (Doc. 38 at 3). The Court prefaced its recommendation granting the defendants' summary judgment motions with the following:

> Turning to the Complaint, the Court finds the facts to be as follows. Taking judicial notice of its records, the Court relies on May v. Patterson, 11–675–KD–B, which sheds relevant background on Plaintiff's condition and amenability (or lack thereof) to adequately provided medical care. In Patterson, Defendants' motion for summary judgment was ultimately granted and Plaintiff's case dismissed with prejudice.
>
> As demonstrated in May v. Patterson, Plaintiff has a longstanding condition, hydrocephalus, for which he has received ample . . . care which he fails to disclose in his present Complaint. In 1990, to accommodate his hydrocephalus, a ventriculoperitoneal ("VP") shunt was implanted to relieve the excessive buildup of cerebrospinal fluid, which occurs in excess as a result of hydrocephalus. (Doc. 69 at 1–2). Plaintiff has been incarcerated at Holman Correctional Facility ("Holman") since March 14, 2008. Since then, and leading up to the resolution of Patterson, Plaintiff received multiple treatments and extensive care for his VP shunt, including but not limited to CT scans of his head, multiple consultations with prison and non-prison radiologists and neurologists, and x-rays, all of which ultimately culminated into a <u>recommendation for shunt-corrective surgery by Dr. Quindlen, a board certified neurosurgeon located in Mobile, Alabama. (Doc. 69 at 2–6). After receiving the recommendation for surgery, Plaintiff repeatedly refused to allow Dr. Quindlen to perform the surgery because Dr. Quindlen was not his surgeon of choice</u> and he questioned whether Dr. Quindlen was following medical protocol. (Doc. 69 at 7).
>
> To the Court's knowledge, the shunt revision has not been performed since it was recommended by Dr. Quindlen and refused

> by Plaintiff in 2010. Based on the amount of coherent filings with which Plaintiff has peppered the Court since the resolution of Patterson, it appears Plaintiff is coping with his condition just fine. Notwithstanding, the Court does acknowledge that hydrocephalus is a serious medical condition and a malfunctioning shunt can deteriorate to the extent that denial of meaningful medical care could rise to the level of deliberate indifference, which is what Plaintiff alleges occurred in this action. (Emphasis added.)

Id. at 4-5.

In CA 14-0155-WS-M, supra, the only medical defendant was LPN Wall, who provided some of plaintiff's medical records in her special report. (Doc. 18). The records showed that plaintiff received a CT scan of his brain on February 21, 2014.[4] (Doc. 18-2 at 26-28). No AVMs were reflected in the reviewing doctor's report, which contained other findings, most notably, "no intracranial bleed or mass effects is seen." (Id. at 27). The records further show that subsequent to the CT scan, in response to plaintiff's inmate notification, on March 27, 2014, Dr. Stone wrote:

> I do not need to see you again re: the matter of a neurology or neurosurgical consult related to your shunt. As I explained to you on your CCC [Chronic Care Clinic][5] visit of 3/5/14, the CT of your head of 2/21/14 is the same or even slightly improved as compared to the CT of 7/22/09. This is my decision at this time. (Emphasis added.)

Id. at 28.

Even though the Court is mindful that plaintiff has a history of medical problems with his head, the Court finds that his complaint does not plausibly allege that he was in "imminent danger of serious physical injury" at the time the complaint was filed due to the actions or inaction of defendant Dr. Barber. Because plaintiff cannot avail himself of §1915(g)'s

---

[4] The CT scan occurred approximately eleven months after the date of the incident, giving rise to this complaint, and prior to filing this action on October 10, 2014.

[5] Chronic Care Clinic is a term with which the Court is familiar from other prisoner cases on its docket. See Black v. Alabama Dep't of Corrs., 578 F. App'x 794, 795 (11th Cir. 2014) (unpublished).

9

exception, and on account of his failure to pay the $400 filing fee at the time he filed this action, plaintiff's action is due to be dismissed without prejudice. Dupree v. Palmer, 284 F.3d 1234, 1236 (11th Cir. 2002) (holding that an action must be dismissed without prejudice when an inmate who is subject to § 1915(g) does not "pay the filing fee at the time he initiates the suit"); Vanderberg v. Donaldson, 259 F.3d 1321, 1324 (11th Cir.) (holding that the filing fee paid must be paid by an inmate subject to § 1915(g) at the time an action is commenced), cert. denied, 535 U.S. 976 (2002). Therefore, it is recommended that this action be dismissed without prejudice pursuant to 28 U.S.C. § 1915(g).

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's factual findings." Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this 21st day of January, 2015.

                        /s/ Katherine P. Nelson
                       **UNITED STATES MAGISTRATE JUDGE**